NOTICE

Decision filed 08/02/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 170357-U

NO. 5-17-0357

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 15-CF-326 |
| | ) | |
| RONALD YARBER, | ) | Honorable |
| | ) | Walden E. Morris, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The defendant failed to establish (a) that the trial court committed plain error in admonishing potential jurors about the Rule 431(b) principles; (b) that his counsel's failure to object to hearsay evidence constituted ineffective assistance of counsel; and (c) that the prosecutor's comments during closing arguments were unfairly prejudicial. Defendant's convictions on 8 counts of predatory criminal sexual assault of a child and 61 counts of criminal sexual assault are vacated where there was insufficient evidence to support those convictions. Defendant's convictions and sentences as to all other counts of predatory criminal sexual assault of a child and criminal sexual assault are affirmed as there was sufficient evidence to establish defendant's guilt beyond a reasonable doubt.

¶ 2   Following a jury trial, the defendant, Ronald Yarber, was convicted of 16 counts of predatory criminal sexual assault of a child and 238 counts of criminal sexual assault.

1

The defendant was sentenced to 14 years in prison on each count of predatory criminal sexual assault of a child and 6 years in prison on each count of criminal sexual assault. All sentences were to run consecutively. On appeal, the defendant contends that his convictions should be reversed and the cause remanded for a new trial because (a) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire*; (b) the defendant's trial counsel provided ineffective assistance in that he failed to object to the admission into evidence of the victim's notebook containing inadmissible hearsay; (c) the prosecutor made improper and unfairly prejudicial comments during closing argument, and (d) the State's evidence was not sufficiently specific to prove beyond a reasonable doubt that the defendant was guilty of 254 separate offenses. For reasons that follow, we affirm in part and vacate in part.

¶ 3                                        I. BACKGROUND

¶ 4                                        A. The Information

¶ 5      On November 6, 2015, the defendant was charged by information with 256 counts of criminal sexual assault for alleged abuses against a single victim over a span of 5½ years. In counts 1 through 16, the State charged the defendant with predatory criminal sexual assault of a child in violation of section 12-14.1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/12-14.1(a)(1) (West 2008)), a Class X felony. The State alleged that during each month from June 2004 through September 2004, the defendant, who was 17 years of age or older, knowingly committed four different acts of sexual penetration upon A.E.A., who was under 13 years of age at the time of the offenses. The acts alleged were penile penetration (counts 1, 5, 9, 13), digital penetration (counts 2, 6,

2

10, 14), cunnilingus (counts 3, 7, 11, 15), and fellatio (counts 4, 8, 12, 16). In counts 17 through 256, the State charged the defendant with criminal sexual assault, alleging that the defendant, a family member of A.E.A., committed acts of sexual penetration against A.E.A., who was under 18 years of age, in violation of section 12-13(a)(3) of the Code (720 ILCS 5/12-13(a)(3) (West 2010)), a Class 1 felony. The State asserted that the defendant committed separate acts of penile penetration, digital penetration, cunnilingus, and fellatio against A.E.A. during the month of October 2004, and in each month thereafter, through and including September 2009.

¶ 6    On June 8, 2016, the State filed six additional counts of criminal sexual assault, alleging the defendant, knowing that A.E.A. was unable to understand the nature of the acts or was unable to consent, committed acts of sexual penetration in that he placed his penis in her vagina in violation of section 12-13(a)(2) of the Code (720 ILCS 5/12-13(a)(2) (West 2010)). The State alleged that these acts occurred during the years 2004 through 2009, and it filed a separate count for each year (counts 257-262).

¶ 7                                B. The Trial

¶ 8    The defendant's trial began on July 20, 2016. During the State's case, the jury learned that the victim, A.E.A., had been diagnosed with autism spectrum disorder (formerly known as Asperger's syndrome) and a learning disability. The State called Dr. James Peterson, a licensed clinical psychologist, to explain the nature of A.E.A.'s autism. Dr. Peterson evaluated A.E.A. in 2008, to determine her eligibility for social security disability. He did not treat A.E.A. or provide any services to her. Dr. Peterson testified that people with A.E.A.'s type of autism typically have difficulty engaging in social and

emotional interaction, understanding non-verbal communication, and forming friendships. During the evaluation, Dr. Peterson noted that A.E.A. had a "flat affect" and was "rather unsophisticated for a 16-year-old" girl. School records indicated that A.E.A. demonstrated poor adjustment in social situations. She had been bullied in school and she exhibited symptoms of depression and isolation. Dr. Peterson testified that the intelligence testing indicated that A.E.A. had good verbal skills, but her ability to visualize, plan, and organize was poor. During cross-examination, Dr. Peterson stated that he had no indication during the evaluation that A.E.A. was being abused at home. He also stated that he did not ask her about any abuse.

¶ 9    A.E.A. was 24 years old at the time of trial. A.E.A. testified that she was born on October 7, 1991, and she moved in with her aunt, Lesa Yarber, when she was seven years old. A.E.A. lived with Lesa and the defendant at the defendant's residence in Saline County from the time she was 7 years old, until she was 17½ years old. The family then moved to a residence in Gallatin County. A.E.A. recalled that she briefly stayed with her father, Clay Alvey, and her stepmother, Cheryl Alvey, in August and September of 2007. Except for that two-month period, A.E.A. lived with Lesa and the defendant until she was 21 years old. She then moved in with her grandparents, Harry and Carolyn Alvey. Her grandmother had cancer and passed away in September 2015. A.E.A. continued to live with Harry Alvey through the time of trial.

¶ 10   A.E.A. identified the defendant and stated that he had been sexually abusing her since she was 12 years old. A.E.A. described the defendant as "very mentally controlling and abusive." She recalled that the defendant sometime smacked her leg so hard that it

4

left red handprints. She also recalled that when she was 10 or 11, the defendant would "hug her from behind," putting his penis against her butt, and that when she attempted to walk away, he would pull her back. A.E.A. indicated that this occurred every few months.

¶ 11   A.E.A. testified that the defendant first engaged her in sexual contact when she was 12½ years old, during the summer between sixth grade and seventh grade. A.E.A. stated that the defendant barged into her room while she was masturbating. The defendant offered to help her and said he would get a wet towel. A.E.A. protested because they were related, but the defendant indicated it would be okay because they were not blood relatives. The defendant placed a dry towel over A.E.A.'s eyes, but she "peeked" and saw him "licking her down there." She also recalled that when she was 12 years old, the defendant penetrated her vagina with a giant ink pen that she had gotten from her aunt's workplace. A.E.A. testified that defendant forced her to suck his penis for the first time in November 2004, after her thirteenth birthday. She had strep throat, and the defendant stayed at home with her while Lesa went to work. A.E.A. was in the bathroom, kneeling by the toilet, and the defendant walked in on her. He told A.E.A. that if she was going to have crushes on black guys, she needed to learn "how to suck the penis and suck it right," and "you need to practice on me first." The defendant tried to get her to "deep throat" his penis. A.E.A. testified that the defendant did not wear a condom during that assault, but he began wearing two condoms after that. A.E.A. testified that the defendant had been penetrating her vaginally and anally since she was 14 years old, and he always wore two condoms. A.E.A. stated that the defendant also penetrated her vagina with his finger.

A.E.A. testified that "the ink pen, licking, and fingering" occurred before she was 13 years old.

¶ 12   A.E.A. stated that the sexual assaults happened frequently, and they varied. "Sometimes it would happen every day and sometimes it would happen every few weeks and sometimes anywhere in between." She said that "it also depended on Lesa's work schedule because he did it while she was gone." A.E.A. clarified that the acts of penile penetration, fingering, fellatio, and cunniligus were "very continuous" and the anal penetration occurred about once every year.

¶ 13   A.E.A. recalled that from the time she was 9 or 10 years old, until she was 15, she was alone with the defendant during the afternoon because the defendant worked until noon and Lesa worked until 5 p.m. A.E.A. began home-schooling at age 15, because of bullying at school. At that time, Lesa was working different shifts at a hospital, and the defendant became a "stay at home" dad, caring for two foster children, Haley and Brianna. When Lesa worked the evening shift, the defendant would sexually assault A.E.A. after he put the foster children down for a nap. A.E.A. testified that when she was 16 years old, the defendant fostered three young children, whom he and Lesa eventually adopted. A.E.A. testified that the defendant would make sure that those children were asleep or occupied before he entered her room. The defendant then removed his clothing and whispered, let's do "the Big-O thing," before he penetrated her vagina with his penis. She also testified that the defendant called her a "newbie." He told A.E.A. that she needed to practice with him, because if she had sex with a boy, and her hymen "popped," it would bleed and freak out the boy. A.E.A. testified that the defendant had her practice

6

rubbing his penis with her hand. A.E.A. also described the defendant's preferred positions and methods of sexual penetration. A.E.A. stated that assaults most often took place in her bedroom, but they sometimes happened in the defendant's bedroom.

¶ 14   A.E.A. testified that after she moved in with her grandparents, the abuse stopped for two years. Then, in April 2015, and again in June 2015, the defendant asked her to come to his home and play with a new puppy. While she was playing with the puppy, the defendant approached her and said, "let's do the Big-O thing." Each time, the defendant took her into his bedroom and penetrated her vaginally. The defendant told A.E.A. to tell her doctors that she masturbated with three fingers if they asked whether she was sexually active.

¶ 15   In November 2015, A.E.A. reported the abuse to her preacher's wife, and then she told her grandfather and stepmother. A.E.A. explained that she decided to report the abuse so that the defendant would stop and so she could move forward with her life. She was also concerned because two girls, whom the defendant and Lesa adopted, were approaching the age at which A.E.A. was first assaulted. A.E.A. testified that she did not tell anyone about the abuse earlier because the defendant had "a temper," and she was afraid of him. She did not tell Lesa because the defendant said Lesa would not believe it and would send A.E.A. to a mental institution. A.E.A. also stated that she had been in denial about the abuse.

¶ 16   Shortly after A.E.A. reported the abuse, she got a notebook and began to write about what she experienced when the defendant sexually assaulted her. A.E.A. identified her notebook during trial. She testified that the first page contained a picture that she had

7

drawn of the defendant's penis and testicles, and the two condoms that he wore filled with ejaculate. The remainder of the notebook contained A.E.A.'s recollections and descriptions of the assaults that she endured. A.E.A. testified that the abuses she had written about in the notebook were the same as those she had testified about, but her notebook included more descriptions about things like the color of the defendant's penis. A.E.A.'s notebook was admitted into evidence, without objection, and her drawing was shown to the jury.

¶ 17    A.E.A. recalled that after she came forward with allegations of the abuse, Lesa was not supportive. When Lesa took A.E.A. for a medical examination, Lesa told A.E.A. what to say. A.E.A. was instructed to say she had been sexually active within the past year. A.E.A. did as she was told, but later reported that she had been sexually abused by the defendant. A.E.A. testified that she reported the abuse to Sheryl Woodham, a counselor at the Guardian Center,[1] a police officer, and the medical providers who performed examinations and testing for sexually transmitted diseases. A.E.A. testified that she suffered from a number of physical and emotional issues as a result of the abuse, including urinary incontinence which started after she was penetrated with objects.

¶ 18    During cross-examination, A.E.A. stated that when the foster kids came into the house, she felt "pushed aside, but probably more worried about them than anything else." A.E.A. acknowledged she had crushes on boys, but she never dated any of them. A.E.A. reiterated that the first time the defendant forced her to have oral sex was in November

---

[1]The Guardian Center is a not-for-profit child advocacy center that provides child sensitive forensic interviews and confidential services to children and families affected by sexual and physical abuse.

8

2004, when she was 13 years old. Before that, the defendant penetrated her with a giant ink pen, and he performed "the licking, the fingering, and the towel thing." She said that the defendant put on condoms in front of her and he used baby lotion as a lubricant. A.E.A. testified that she began counseling in 2006. She did not reveal the abuse to her counselors because she was dealing with other issues, including obsessive compulsive disorder, depression, anxiety, and Asperger's syndrome.

¶ 19    The State's next witness, Brianna Newton Hutcherson, was six or seven years old, when she and her two younger sisters were fostered by the defendant and his wife. Brianna testified that A.E.A., who was then 13 or 14 years old, also lived in the home. Brianna recalled that the defendant only interacted with A.E.A. He would lock Brianna and her sisters in their room while he interacted with A.E.A. Brianna stated that the defendant would go into A.E.A.'s room and would not come out for a long time. She said this happened "a lot"—"multiple times during the day and night."

¶ 20    Sheryl Woodham, the director of the Guardian Center, testified in the State's case. Woodham testified that she had special training in conducting forensic interviews of children and adult sexual assault victims. On November 3, 2015, Woodham conducted a recorded interview with A.E.A. During the interview, A.E.A. made disclosures about the sexual abuse she endured. Woodham noted that A.E.A. displayed some of the common characteristics of child sexual abuse accommodation syndrome. Woodham testified that delayed disclosure, secrecy, fear, and recantation are common characteristics of the syndrome. Woodham opined that A.E.A.'s delayed disclosure was not unusual, and that children often realize that they can do nothing to stop the abuse, so they cope by

acquiescing or submitting to the offender, particularly if they depend on the offender for fulfillment of basic needs.

¶ 21    Casey Carlyle, A.E.A.'s primary care provider, testified in the State's case. Carlyle was a nurse practitioner, specially trained to perform medical examinations on victims of sexual abuse and assault. On December 3, 2015, Carlyle performed a sexual assault examination on A.E.A. During the evaluation, A.E.A. gave a history of having been sexually assaulted on multiple occasions by the defendant while her aunt was at work. A.E.A. reported that the sexual assaults began a few months before her thirteenth birthday. She stated that the defendant forced her to provide him with oral sex, that he penetrated her vagina with his fingers and his penis multiple times while wearing two condoms, and that he penetrated her anus with his penis. She described the vaginal and anal penetration as painful. A.E.A. stated that the last assault occurred four months prior to the examination. She denied prior sexual activity with anyone other than the defendant. She felt the defendant took advantage of her mental health issues. A.E.A. stated that she decided to report the abuse because she feared that her adopted sisters might be subjected to similar abuses.

¶ 22    During the physical examination, Carlyle noted that A.E.A. had a flat affect, anxiety, and an elevated heart rate. The examination revealed four hymen defects. The hymen defects were "non-specific," meaning that there were no acute tears, but they were consistent with A.E.A.'s history of sexual abuse. Carlyle made a finding of sexual abuse based upon a clear and consistent history of sexual abuse with non-specific physical

findings. Carlyle also found emotional abuse because A.E.A.'s aunt, Lesa Yarber, asked A.E.A. not to identify the alleged perpetrator and to deny prior sexual activity.

¶ 23 During cross-examination, Carlyle testified that she provided psychiatric care to A.E.A. prior to March 2015. Carlyle stated that she did not routinely ask A.E.A. about sexual activity, and that A.E.A. denied being sexually active the few times she was asked. Carlyle was asked, hypothetically, whether the hymen defects could have resulted from masturbating with objects. Carlyle answered, hypothetically, that it would depend on the size of the object. Carlyle noted that she did not have substantial evidence to support the hypothetical posed. Carlyle testified that these types of defects typically result from sexual intercourse, but they could result from blunt force trauma.

¶ 24 Dr. Kathy Swafford also testified in the State's case. Dr. Swafford was a physician, board certified in trauma and sexual abuse, and she had been previously qualified as an expert in the circuit court. Dr. Swafford trained Casey Carlyle and continued to oversee Carlyle's sexual abuse examinations. Dr. Swafford reviewed Carlyle's report on A.E.A.'s examination and agreed that A.E.A. had a clear and consistent history of child sexual abuse with non-specific physical findings. During cross-examination, Dr. Swafford testified that A.E.A.'s hymen defects could have been caused by a variety of things, including sexual penetration by an erect penis.

¶ 25 The State's final witness was A.E.A.'s 75-year-old grandfather, Harry Alvey. Alvey testified that he became A.E.A.'s guardian when A.E.A. turned 18 years old. In 2015, A.E.A. told Alvey that the defendant had sexual relations with her. Alvey then summoned his daughter, Lesa Yarber, and his son, Clay Alvey, to his home and told them

11

about A.E.A.'s disclosure. Alvey testified that he had not suspected that A.E.A. was being physically abused, but thought she was, perhaps, being mentally abused because she isolated herself and spent a lot of time in her room.

¶ 26 The State then rested, and the defendant called Lesa Yarber as his first witness. Lesa testified that A.E.A. was seven years old when she came to live with Lesa and her first husband. Shortly thereafter, Lesa separated from her husband. Lesa began dating the defendant, and they eventually married. Lesa and A.E.A. moved into the defendant's trailer home in Saline County in 1998. From 2003-2008, Lesa worked at Turner Manor, a residential facility for persons with developmental disabilities. The defendant also worked at Turner Manor. Lesa worked from 8 a.m. to 4:30 p.m., and the defendant ordinarily worked a split shift—from 5 a.m. to 9 a.m., and 2:30 p.m. to 8:30 p.m. Lesa initially testified that A.E.A. was not home alone with the defendant during this time. Lesa later acknowledged that while she was at work, she often left A.E.A. at home alone with the defendant.

¶ 27 Lesa testified that she and the defendant decided to become foster parents in 2006. They were licensed in June 2007, and the defendant became a full-time, stay-at-home foster dad. Lesa recalled that when the foster children arrived, A.E.A. began spending more time in her room. A.E.A. did not want to interact with them, and she eventually asked to move. During August and September of 2007, A.E.A. lived with her biological father and his wife. That situation proved difficult, so A.E.A. returned to the defendant's home in October 2007.

¶ 28   Lesa testified that she handled any issues that related to the sexual development of A.E.A. and the foster girls. She recalled that A.E.A. began to masturbate a lot with a wide variety of objects, including "hairbrushes, barbie dolls, anything with handles on them." Lesa removed those objects from A.E.A.'s room so that A.E.A. did not get an infection or injure herself. Lesa did not inform medical providers about A.E.A.'s masturbation activities because they did not ask.

¶ 29   Lesa testified that A.E.A. first made allegations against the defendant a few weeks after A.E.A.'s twenty-third birthday. Lesa did not plan a birthday party for A.E.A. because it was too soon after the death of Lesa's mother. A few weeks later, Lesa had a birthday celebration for her father, Harry Alvey. During the party, A.E.A. and the defendant got into an argument. A week later, A.E.A. told her stepmother that the defendant was sexually abusing her. Lesa learned of the allegations the following day. Lesa testified that she confronted A.E.A., asking why A.E.A. was just now reporting the allegations. A.E.A. replied that if she was not going to get any more birthday presents, she might as well tell. When informed of A.E.A.'s allegations, Lesa could not believe they were true. Lesa did not believe the defendant would have an interest in a young child, let alone someone with developmental disabilities. Lesa testified that A.E.A. looked up to the defendant, like a father, and that the defendant looked out for her and protected her.

¶ 30   Lesa testified that she called Melissa Gaither, a health care provider at the Ferrell Hospital Family Practice, to schedule a medical evaluation for A.E.A. Lesa also phoned Jeremy Jobst, one of A.E.A.'s former counselors, and informed him of the situation. Lesa

testified that she wanted Jobst to talk with A.E.A. and determine what had occurred before making a report, but Jobst indicated that he was required to make a hotline report of suspected abuse. Lesa admitted that she told A.E.A. what to disclose to Melissa Gaither. A.E.A. was told to say that she had been sexually active and needed to get checked out. Lesa also informed Melissa Gaither that A.E.A. had been sexually active and needed a pap smear, herpes testing, and all of the sexually transmitted disease (STD) testing. After all of the testing was completed, Melissa asked A.E.A. some additional questions, and A.E.A. "started in on her talk." At that point, Lesa told Melissa that "we know who it is," and it has already been reported, and "there was no need to come in and explain the whole story to you." Lesa acknowledged that she wanted A.E.A. tested because both she and the defendant had herpes. Lesa testified that she and the defendant did not use condoms during sex relations because Lesa could not conceive, and she never found condoms in the house.

¶ 31 Bonnie Mahan testified in the defendant's case. Mahan was an administrator at Turner Manor when Lesa Yarber worked there. Mahan testified that she had a daughter who was autistic and that Mahan and Lesa often compared notes. Mahan recalled that Lesa frequently brought A.E.A. to work. Mahan observed that A.E.A. said anything that came to her mind, and that she and Lesa often "redirected" A.E.A., advising A.E.A. to refrain from talking about private matters in public. Mahan testified that she was trained and certified in crisis prevention and intervention with persons on the autism spectrum. Based on those credentials, Mahan was allowed to offer an expert opinion that it was unlikely that A.E.A. would ever withhold information based on fear. Mahan stated that

14

A.E.A. could not keep a secret, and that if A.E.A. was involved in sexual activity with anyone, she would have talked about it. During cross-examination, Mahan acknowledged that she had no training or experience in dealing with victims of sexual abuse and assault.

¶ 32    Jeremy Jobst testified that he conducted a crisis screening on A.E.A. when she was 16 or 17 years old. During the screening, A.E.A. reported suicidal thoughts, but she did not report that she was being abused at home. Jobst testified that while he was a youth coordinator at the health department, A.E.A. participated in a youth group that advocated for mental health awareness. During that time, A.E.A. spoke about her mental health issues and some prior abusive behavior by her biological mother, but she did not mention the defendant. During cross-examination, Jobst acknowledged that at the time A.E.A. spoke about her mother's abusive behavior, she had been away from her mother for several years.

¶ 33    The defendant testified that he first met A.E.A. at Turner Manor, when she was six or seven years old. A year later, he and Lesa got together. Lesa and A.E.A. moved into the defendant's home around 1998 or 2000. He described A.E.A. as "a handful." She did not sit still and said whatever came into her mind. The defendant testified that he only corrected A.E.A. a few times. The defendant recalled that when A.E.A. was 13 or 14 years old, he hit her with an empty paper towel roll because she "tried to run her mom up against the wall a couple of times." The defendant testified that Lesa took care of matters surrounding the sexual development of A.E.A., including her hygiene and masturbation habits. Lesa also took care of the girls if they had "yeast infections or needed butt cream." He consciously stayed away from that because he was not comfortable with it. The

15

defendant denied having any type of sexual relations with A.E.A. He stated that he liked grown women, and that "all he had was grown women." The defendant also denied using condoms. He testified that he did not use condoms because he was married and Lesa was not able to have children. The defendant also testified that he had visible bleeding blisters on his penis as a result of herpes.

¶ 34 The defense rested, and the State offered no evidence in rebuttal. Following closing arguments, the jury received its final instructions. The jury began its deliberations at 12:05 p.m. At approximately 1:32 p.m., the jury sent a note asking for the dates that A.E.A. was "living with Ron & Lesa Yarber" and "with Clay and Cheryl Alvey." At 1:41 p.m., pursuant to an agreement between the defendant and the State, the court sent the following response: "August and September 2007." At 3:09 p.m., the jury sent a second note, announcing "they were done." The jury returned not guilty verdicts on counts 153 through 160 but found the defendant guilty on all other counts. When polled, each juror indicated that these were his or her verdicts. The defendant's posttrial motion was denied. The defendant was sentenced to 14 years in prison on each count of predatory criminal sexual assault and 6 years in prison on each count of criminal sexual assault. All sentences were to be served consecutively. The defendant's motion to reconsider his sentences was denied and this appeal followed.

¶ 35 II. ANALYSIS

¶ 36 A. Rule 431(b) Admonishments

¶ 37 Initially, the defendant contends that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) while questioning prospective jurors about

16

the principles outlined in *People v. Zehr*, 103 Ill. 2d 472 (1984) (superseded by Ill. S. Ct. R. 431(b) (eff. July 1 2012)).[2] The defendant claims that the trial court impermissibly collapsed all four principles into one general proposition of law, and thereby failed to provide each potential juror with the opportunity to respond to each distinct principle. The defendant also claims that the length of time between the trial court's recitation of the *Zehr* principles and the questioning of prospective jurors about whether they understood and accepted those principles was too long to satisfy Rule 431(b). The defendant acknowledges that he forfeited this issue by failing to raise it in the trial court and requests review under the plain-error doctrine. The defendant argues that the evidence in the case was so closely balanced that the court's clear and obvious error alone threatened to tip the scales of justice against him.

¶ 38    The plain-error doctrine permits a reviewing court to consider an unpreserved error when either (1) "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In both instances, the burden of persuasion remains with the defendant. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). When

---

[2]In *People v. Zehr*, 103 Ill. 2d 472, 477 (1984), the Illinois Supreme Court held that "essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him." The "*Zehr* principles" were adopted in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

conducting plain-error review, the first step is to determine whether there was a clear and obvious error. *Herron*, 215 Ill. 2d at 187. Therefore, we must initially determine whether the trial court complied with the requirements of Rule 431(b) when the court questioned prospective jurors.

¶ 39 Supreme Court Rule 431 (eff. July 1, 2012) sets forth certain requirements for *voir dire* examinations in criminal cases. Rule 431(b) provides as follows:

> "(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 40 Rule 431(b) mandates "a specific question and response process." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). The trial court is required to ask prospective jurors whether they understand and accept the enumerated principles in Rule 431(b). *Thompson*, 238 Ill. 2d at 607. While prospective jurors may be questioned "individually

18

or in a group," the method of inquiry requires that each prospective juror have an opportunity for a response regarding his or her understanding and acceptance of those principles. *Thompson*, 238 Ill. 2d at 607. There is, however, no requirement that the trial court recite a principle and then question each potential juror on that individual principle. *People v. Birge*, 2021 IL 125644, ¶ 34. "Under the plain language, a court complies with Rule 431(b) if it (1) instructs the prospective jurors on the four principles, (2) asks if the prospective jurors understand those principles, and (3) asks if the prospective jurors accept those principles. *Birge*, 2021 IL 125644, ¶ 34.

¶ 41    The record shows that the trial court addressed the entire group of prospective jurors at 9:48 a.m. The court introduced the parties, read the statement of the case, including a summary of the charges against the defendant, and identified the potential witnesses. At 10:20 a.m., the court admonished the entire group of prospective jurors:

"Now, I've told you this is a criminal trial. And there are four cardinal or primary principles that apply to all criminal trials in the State of Illinois. And I'm going to tell you what those four cardinal principles are at this time. And then when you are being questioned individually later, I will ask you specifically whether your understand and accept those four principles."

¶ 42    The court immediately related all of the Rule 431(b) principles to the entire group of prospective jurors. After the court briefly commented on the importance of jury service, the first 15 prospective jurors were seated in the jury box. The court addressed the first prospective juror and asked whether she had any knowledge about the case, the parties, and the witnesses; whether she had prior jury experience; and whether she or a

19

close friend or family member had been either accused of a crime or the victim of a crime. In the final question in the series, the court asked: "I have told you that there are four principles of law that apply to this case. Do you understand and accept those four principles?" The first prospective juror immediately replied, "Yes." The court proceeded to ask each of the remaining 14 prospective jurors that same series of questions. When each prospective juror was asked whether he or she understood and accepted the four principles, each responded, "Yes." The questioning of the first 15 prospective jurors concluded at 11:02 a.m. During a 30-minute recess, eight jurors were selected from the first panel. At 11:31 a.m., the next panel of 15 prospective jurors was seated in the jury box. At that time, the trial court did not restate the four 431(b) principles. The court proceeded to question each prospective juror in the same fashion and with same series of questions. When each prospective juror was asked whether he or she understood and accepted the four principles, each responded affirmatively. The questioning of the second panel concluded at 12:07 p.m. Four jurors and two alternate jurors were selected from that panel, and the jury selection concluded at 12:45 p.m.

¶ 43    In this case, the record shows that the trial court carefully admonished the entire group of prospective jurors about each of the Rule 431(b) principles, and then questioned each prospective juror individually about his or her understanding and acceptance of those principles. The manner of questioning offered each prospective juror an opportunity to reply, and each of the potential jurors gave a verbal response. Contrary to the defendant's contention, the trial court was not required to question the prospective jurors about each principle separately. See *Birge*, 2021 IL 125644, ¶¶ 34, 41.

¶ 44   The defendant also argues that the time period between the trial court's recitation of the Rule 431(b) principles and its inquiry into whether prospective jurors understood and accepted the principles was too long to satisfy the requirements of Rule 431(b). Rule 431(b) does not set forth any particular limit on the amount of time between the trial court's recitation of the four principles and the questioning of prospective jurors about those principles. Nevertheless, our colleagues in the Fourth District have considered this issue and determined that in keeping with the purpose of Rule 431(b), the questioning ought to occur within a reasonable time after the court recites the principles. See *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 44 (an hour's delay, including 15-minute recess, between the recitation of the 431(b) principles and asking prospective jurors whether they understood and accepted those principles "tends to defeat the purpose of the questioning and threatens to reduce it to a *pro forma* exercise"); see also *People v. Bowens*, 407 Ill. App. 3d 1094, 1105 (2011) (although it would be a better practice for the court to ask prospective jurors whether they understood and accepted the Rule 431(b) principles immediately (or close thereto) after its explanation of those principles, the short delay, without a recess, between the recitation of the 431(b) principles and questioning of prospective jurors about them was not error under the facts of the case).

¶ 45   Here, immediately prior to reciting the Rule 431(b) principles, the trial court warned the entire group of jurors that they would be asked whether they understood the principles and accepted them. The record shows there was no more than a few minutes' delay between the court's recitation of the Rule 431(b) principles and the commencement of questioning the first 15 prospective jurors. There was, however, more than a one-hour

21

gap, including a 30-minute recess, between the recitation of the Rule 431(b) principles and the court's questioning of the second group of 15 prospective jurors. Under the facts presented here, we believe the gap was too long to satisfy the purpose underlying the Rule 431(b) inquiry. *Wrencher*, 2011 IL App (4th) 080619, ¶ 44. In this regard, the trial court's method of inquiry was error.

¶ 46 Having concluded that there was a clear error, we must determine whether the evidence was closely balanced. When determining whether the evidence was closely balanced, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of that evidence within the context of the case. *People v. Sebby*, 2017 IL 119445, ¶ 53.

¶ 47 The testimony in this case has been set forth in great detail in this disposition. That testimony established that the defendant committed acts of predatory criminal sexual abuse and criminal sexual assault against A.E.A. over a span of 5½ years. A.E.A. testified that the defendant sexually assaulted her on a regular basis—sometimes every day, sometimes every few weeks—from 2004 through 2009. A.E.A. described in great detail four specific assaults that were seemingly seared into her memory. She also described the defendant's preferred positions and methods of sexual penetration. A.E.A. testified that she did not report the abuse earlier because the defendant said that no one would believe her, and she would be sent to a mental institution. A.E.A.'s testimony remained clear and consistent throughout a lengthy cross-examination. A.E.A.'s testimony was partially corroborated by Brianna Newton Hutcherson. During the months in which Brianna and her sisters were fostered by the defendant, Brianna observed that the defendant only paid

attention to A.E.A. Brianna saw the defendant enter A.E.A.'s room and not come out for a long time. Brianna stated that this happened "multiple times" during the day and night. Nurse practitioner Casey Carlyle and Dr. Kathy Swafford testified the victim gave a clear and consistent history of sexual abuse and that the hymen defects found during the sexual abuse examination were consistent with vaginal penetration by an erect penis. Sheryl Woodham, a licensed clinical social worker, testified that A.E.A.'s delayed reporting of the sexual offenses was not unusual, and that sexually abused children often delay disclosure.

¶ 48    In his defense, the defendant attempted to attack the credibility and reliability of A.E.A.'s testimony through his own witnesses. The defendant's wife, Lesa Yarber, initially testified that the defendant was rarely home alone with A.E.A. Lesa later conceded that while she was at work, she often left A.E.A. at home with the defendant. Lesa Yarber admitted that she instructed A.E.A. about what to say and what to withhold from physician's assistant, Melissa Gaither, when A.E.A. was tested for sexually transmitted diseases. The defendant offered Lesa Yarber's testimony that A.E.A. masturbated frequently, using objects with a handle, as a possible explanation for A.E.A.'s hymen defects, but this explanation was unsupported by medical evidence. The defendant's other witness, Bonnie Mahan, was permitted to offer an expert opinion that A.E.A. would not withhold disclosure out of fear. Mahan, however, acknowledged that she had no experience or training in dealing with victims of sexual assault or sexual trauma. The defendant testified, but he simply denied that he had sexual relations with A.E.A.

23

¶ 49    In this case, the transcript of the trial proceedings reveals the nuances of motive, bias, and interest in the witnesses' testimony. Having evaluated the totality of the evidence and having conducted a qualitative, commonsense assessment of that evidence within the context of the case, we do not find that the evidence was closely balanced. Rather, the evidence of defendant's guilt was overwhelming. Therefore, the defendant has failed to demonstrate that the trial court's lack of compliance with Rule 431(b) constituted plain error.

¶ 50                    B. Ineffective Assistance of Trial Counsel

¶ 51    Next, the defendant contends that his trial counsel was ineffective in that he failed to object to the admission of the victim's notebook as substantive evidence. The defendant claims that a drawing of the defendant's penis and other writings made in the notebook constituted inadmissible hearsay, that no recognized hearsay exception applied, and that the evidence was unfairly prejudicial. The defendant also claims that his counsel failed to ask for a limiting instruction on the use of this evidence, and as a result, the jury was permitted to page through the notebook and read about details that were not part of the victim's in-court testimony.

¶ 52    To succeed on a claim of ineffective assistance of trial counsel, a defendant must prove that defense counsel's performance fell below an objective standard of reasonableness, and that but for counsel's unprofessional errors, there was a reasonable probability that the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Johnson*, 218 Ill. 2d 125, 143-44 (2005). A reasonable probability is a probability sufficient to undermine confidence in

the outcome. *Strickland*, 466 U.S. at 694. To establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction was the result of sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). Generally, decisions regarding what to object to and when to object are considered matters of trial strategy. *Perry*, 224 Ill. 2d at 344. However, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant. *Strickland*, 466 U.S. at 697; *Perry*, 224 Ill. 2d at 342. If it is easier to dispose of an ineffective assistance claim on the ground of lack of sufficient prejudice, that course should be followed. *Strickland*, 466 U.S. at 697; *Perry*, 224 Ill. 2d at 342.

¶ 53    During direct examination, A.E.A. testified that she wrote down her recollections of some of the sexual assaults in a notebook. She authenticated the notebook, its drawing and written content as her own. The notebook was marked as People's Exhibit 1, and it was later admitted into evidence without objection and without a limiting instruction on its use. The content of the notebook is handwritten, and some of the writing is difficult to decipher. With the exception of a little more commentary regarding the assaults about which A.E.A. testified, the content of the notebook revealed nothing new and was cumulative of A.E.A.'s in-court testimony. Thus, the notebook's content was merely duplicative of properly admitted evidence. In addition, defendant's counsel had the opportunity to test that evidence when he extensively cross-examined A.E.A. After reviewing the record, we find that the defendant has not satisfied the prejudice prong of *Strickland* and, therefore, cannot prevail on his ineffective assistance claim. As a result,

25

we need not determine whether the failure to object to the admissibility of the notebook and to seek a limiting instruction constituted deficient representation.

¶ 54                    C. Propriety of the State's Closing Argument

¶ 55    Next, the defendant argues that the prosecutor committed reversible error during closing arguments because she repeatedly vouched for the credibility of the victim, describing her as "the most compelling and credible witness," with a "phenomenal" memory, while attacking the credibility of Lesa Yarber. Specifically, the defendant contends that the prosecutor improperly argued that Lesa Yarber discounted the medical evidence of sexual assault and "sabotaged the case at every opportunity." The defendant concedes that he did not object to these comments at the time they were made, and he did not raise this issue in his posttrial motion. He claims that the improper conduct deprived him of a fair trial, and he requests plain-error review under both prongs of the plain-error doctrine.[3]

¶ 56    Closing arguments must be reviewed in their entirety and the challenged remarks must be viewed in context. *People v. Macri*, 185 Ill. 2d 1, 62 (1998). Generally, prosecutors have wide latitude in making their closing arguments. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Prosecutors are permitted to "comment on the evidence and any fair, reasonable inferences it yields," but they may not argue facts not contained in the record. *Glasper*, 234 Ill. 2d at 204. Prosecutors are also permitted to denounce the

---

[3]Earlier in this disposition, we determined that the evidence in this case was not closely balanced. Therefore, the alleged error will be reviewed under the second prong of plain error. Under the second prong, unpreserved error may be considered when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565.

accused, reflect on the credibility of the witnesses, and urge the fearless administration of the law, provided those arguments are based on facts in the record or inferences fairly drawn from those facts. *People v. Bryant*, 94 Ill. 2d 514, 523-24 (1983). Prosecutors are not to engage in inflammatory and unfounded closing arguments, and each case must be decided on its own facts. *Bryant*, 94 Ill. 2d at 523. A prosecutor's comments during closing argument will result in reversible error only when they create substantial prejudice against the defendant such that it is impossible to determine whether the jury's verdict resulted from the comments or the evidence. *Macri*, 185 Ill. 2d at 62. In determining whether the prosecutor's remarks are clearly prejudicial, courts will consider the content of the language used, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. *People v. Kliner*, 185 Ill. 2d 81, 151-52 (1998).

¶ 57   In this case, the defendant questioned the credibility and reliability of A.E.A.'s testimony throughout the trial. During closing argument, the prosecutor described A.E.A.'s testimony as specific and very consistent, and her demeanor as open and forthcoming. In contrast, the prosecutor argued that Lesa Yarber's testimony was not credible. The prosecutor asserted that Lesa Yarber had attempted to sabotage the case throughout her testimony. The prosecutor pointed to Lesa Yarber's admission that she instructed A.E.A. to refrain from disclosing the sexual abuse and the identity of the offender. The prosecutor also pointed to Lesa Yarber's testimony regarding A.E.A.'s masturbation habits and argued that Lesa Yarber attempted to discount the medical evidence regarding the hymen defects. The record shows that the prosecutor's comments

27

regarding Lesa Yarber's credibility were based on Lesa Yarber's own testimony and the reasonable inferences drawn from it. The record also demonstrates that the trial court properly instructed the jury that the attorney's closing arguments were not evidence. After reviewing the entirety of the prosecutor's closing argument and the challenged remarks in context, we find that the challenged remarks were reflections on the credibility of the witnesses and the plausibility of the defendant's theory of defense. Accordingly, we find no error, and therefore no plain error.

¶ 58                    D. Sufficiency of the Evidence

¶ 59    In his final two points, the defendant challenges the sufficiency of the evidence. The defendant claims that A.E.A.'s testimony was too vague to prove beyond a reasonable doubt that he committed 254 separate and distinct acts of sexual penetration. He also claims that A.E.A.'s own testimony disproved some of the charges. He requests that this court vacate those convictions for which there is insufficient proof.

¶ 60    When a defendant challenges the sufficiency of the evidence, the reviewing court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is the role of the trier of fact to make determinations regarding the credibility of the witnesses, the weight to be accorded their testimony, and the reasonable inferences to be drawn from the evidence, and a reviewing court will not substitute its judgment for that of the trier of fact on those matters. *Collins*, 106 Ill. 2d at 261-62. A reviewing court, however, is not absolutely

28

bound by the trier of fact's verdict, as the court's ultimate duty is to independently evaluate the reasonableness of a guilty verdict. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). A defendant's conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that no reasonable person could accept it beyond a reasonable doubt. *People v. Wright*, 2017 IL 119561, ¶ 70; *Cunningham*, 212 Ill. 2d at 280.

¶ 61    Initially, the defendant argues that A.E.A.'s testimony was too vague to prove beyond a reasonable doubt that he committed 254 separate and distinct acts of sexual penetration. Citing *People v. Letcher*, 386 Ill. App. 3d 327, 333 (2008), the defendant acknowledges that Illinois courts have accepted vague testimony where a "resident child molester" has continuous access to his victim. In such cases, the victim typically testifies to repeated acts of molestation occurring over a substantial time period, but lacking any meaningful reference point, the victim is unable to offer many specific details, dates, or distinguishing characteristics as to individual assaults. The defendant argues, however, that even under this permissive standard, the large number of counts alleged herein does not support 254 separate and distinct penetrations.

¶ 62    In *Letcher*, 386 Ill. App. 3d 327, the defendant was charged with 14 counts of predatory criminal sexual assault of a child. During the trial, the victim testified that the defendant began abusing her when she was six years old. The victim stated that, in her old house, and again in her new house, the defendant used his penis on her bottom and her vagina. The victim testified that the acts of sexual penetration occurred "too many times to remember." The victim described another occurrence where the defendant used

his penis on the victim's bottom and vagina, stating that it happened in the new house, two days before Christmas. *Letcher*, 386 Ill. App. 3d at 329-30. The trial court found defendant guilty on eight counts of predatory criminal sexual assault of a child involving penile penetration, and not guilty on six counts of predatory criminal sexual assault of a child involving digital penetration. The court sentenced the defendant to 20 years on each count, and the sentences were to run consecutively. *Letcher*, 386 Ill. App. 3d at 330. On appeal, the *Letcher* court was asked to consider whether the victim's testimony that the various incidents happened "too many times to remember," without pointing to a specific number of incidents, was sufficient to support the convictions on eight counts of the information. The court noted that there was little case law in Illinois addressing when generic evidence about the number of sexual abuse offenses may be sufficient to prove guilt beyond a reasonable doubt on all counts, and it considered cases from foreign jurisdiction, including a commonly cited case, *People v. Jones*, 792 P.2d 643, 645 (Cal. 1990). *Letcher*, 386 Ill. App. 3d at 333-35.

¶ 63    In *People v. Jones*, the California Supreme Court was asked to consider whether a victim's generic testimony as to frequent molestations involving oral copulation by the defendant at five separate locations was sufficient to support the defendant's convictions on four counts of lewd conduct on a child under the age of 14. *Jones*, 792 P.2d at 645. In considering the sufficiency of generic testimony, the *Jones* court pointed out that "even generic testimony (e.g., an act of intercourse 'once a month for three years') outlines a series of *specific*, albeit undifferentiated, incidents *each* of which amounts to a separate

offense, and *each* of which could support a separate criminal sanction." (Emphases in original.) *Jones*, 792 P.2d at 654. The *Jones* court went on to state:

> "The victim, of course, must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us') to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (Emphases in original.) *Jones*, 792 P.2d at 655-56.

¶ 64 The *Letcher* court noted that the *Jones* court and courts in other jurisdictions had held that a child victim need not specify the exact number of times the sexual acts occurred so long as there were some "reliable indicia" that the number of acts charged actually occurred. See *Letcher*, 386 Ill. App. 3d at 334-35 (and cases cited therein). Applying the considerations articulated in *Jones*, the *Letcher* court determined that there was sufficient evidence to affirm six of the eight counts of penile penetration. The court

31

concluded, however, that the victim's general testimony that the sexual abuse happened "too many times to remember" was not sufficiently specific to support inferences of two additional instances of penile penetration beyond a reasonable doubt. *Letcher*, 386 Ill. App. 3d at 335-36.

¶ 65 Here, A.E.A. testified in great detail about specific acts committed by the defendant beginning when she was 12½ years old. She testified specifically about the first time each type of penetration occurred. A.E.A. stated that the defendant performed cunnilingus on her for the first time when she was 12½ years old. She specifically recalled that it was during the summer between sixth grade and seventh grade. A.E.A. testified that when she was 12 years old, the defendant penetrated her with the giant ink pen that she had gotten from her aunt's workplace. She stated that "the ink pen, licking, and fingering" all began before she was 13 years old. A.E.A. testified that she was 13 years old when the defendant placed his penis into her mouth and forced her to perform fellatio on him for the first time. She recalled that this act occurred in November 2004, when she stayed home from school because of strep throat. A.E.A. stated that the defendant had been penetrating her vaginally and anally with his penis since she was 14 years old. A.E.A. also testified the sexual acts occurred most often in her bedroom and sometimes in the defendant's bedroom.

¶ 66 A.E.A. provided the time frame for the acts of sexual abuse and sexual assault. She stated that the sexual acts began when she was 12½ years old, and that, with the exception of a two-month period in August and September 2007, she was continuously subjected to them until she moved into the home of her grandparents. When questioned

32

about the frequency of the sexual acts, A.E.A. distinguished between the anal penetration and the other acts. She specifically stated that the anal penetration occurred infrequently, about once a year, and that the acts of penile/vaginal penetration, fingering, fellatio, and cunnilingus were "very continuous." She stated that "sometimes it would happen every day and sometimes it would happen every few weeks and sometimes anywhere in between." She noted that "it also depended on Lesa's work schedule because he did it while she was gone." The time frames identified by A.E.A. align with the evidence regarding the hours that the defendant worked while employed at Turner Manor, and the time when he became a stay-at-home foster dad.

¶ 67 Any issues with regard to A.E.A.'s credibility as to when, where, and how often these acts of sexual penetration occurred was for the jury to resolve. The fact that A.E.A. did not furnish specific dates is not detrimental to the case as victims of repeated abuse are typically unable to provide such details. See *Letcher*, 386 Ill. App. 3d at 333 (noting that a victim of repeated abuse by an individual inside the home is typically "unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assault" (internal quotation marks omitted)). A.E.A.'s testimony outlined a series of specific, albeit undifferentiated, incidents, over a span of more than five years, each of which amounted to a separate offense and each of which could support a separate criminal penalty.

¶ 68 Furthermore, we note that each verdict form was clearly limited to one type of sexual penetration that allegedly occurred in a particular month and year, and those time periods comported with A.E.A.'s testimony regarding the 5½-year time period during

33

which she was repeatedly sexually assaulted by the defendant. We presume the jury understood the separate verdict forms and the relevant time periods because it found the defendant not guilty of eight counts of criminal sexual assault allegedly committed in August 2007 and September 2007. Therefore, with the exceptions noted below, we find that the testimony of A.E.A. was sufficiently specific to sustain the jury's findings of guilt beyond a reasonable doubt on the charges of predatory criminal sexual assault of a child and criminal sexual assault.

¶ 69 The defendant also argues that A.E.A.'s own testimony disproved some of the charges. We agree.

¶ 70 In this case, the defendant was charged with 16 counts of predatory criminal sexual assault based upon four separate types of penetration—penile, digital, cunnilingus, and fellatio—occurring in the months of June 2004, July 2004, August 2004, and September 2004. Because A.E.A. turned 13 years old on October 7, 2004, the defendant was charged with individual counts of criminal sexual assault for committing those same four types of penetration on a family member in October 2004, and in each month thereafter, through and including September 2009. Thus, the State apportioned the four types of sexual penetration allegedly committed each month into individual counts in the information. The jury was given a separate set of verdict forms (guilty and not guilty) conforming to each specific offense charged in the information.

¶ 71 A.E.A. specifically testified that the first time the defendant placed his penis into her mouth and forced her to perform fellatio on him was when she was 13 years old. She stated that it occurred in November 2004, when she stayed home from school because of

34

strep throat. Thus, the State failed to prove beyond a reasonable doubt that the defendant forced A.E.A. to perform fellatio on him at any time before November 2004. Accordingly, the convictions on counts 4, 8, 12, and 16, for predatory criminal sexual assault of a child, based on specific acts of fellatio allegedly committed prior to November 2004, must be vacated. Likewise, the conviction on count 20, for criminal sexual assault, based on a specific act of fellatio allegedly committed prior to November 2004, must be vacated.

¶ 72    Additionally, A.E.A. specifically testified that the defendant had been penetrating her vaginally with his penis since she was 14 years old. Thus, the State failed to prove beyond a reasonable doubt that the defendant penetrated A.E.A.'s vagina with his penis at any time before October 7, 2005, when A.E.A. turned 14 years old. Thus, the convictions on counts 1, 5, 9, and 13 of the information, for predatory sexual assault of a child, based on specific acts of penile-vaginal penetration allegedly committed prior to October 2005, must be vacated. Likewise, the defendant's convictions on counts 17, 21, 25, 29, 33, 37, 41, 45, 49, 53, 57, and 61, for criminal sexual assault, based on specific acts of penile-vaginal penetration allegedly committed prior to October 2005, must also be vacated.

¶ 73    In counts 161 through 208 of the information, the defendant was charged with criminal sexual assault under section 12-13(a)(3) of the Code (720 ILCS 5/12-13(a)(3) (West 2010)). Under that section, the State was required to prove that the defendant committed an act of sexual penetration when A.E.A. was under 18 years of age and that the defendant was a "family member." 720 ILCS 5/12-13(a)(3) (West 2010). At the time of the charged conduct, "family member" was statutorily defined as "a parent,

grandparent, or child, whether by whole, half-blood or adoption and includes a step-grandparent, step-parent or step-child." 720 ILCS 5/12-12(c) (West 2008).[4] "Family member" was further defined as "where the victim is a child under 18 years of age, an accused who has resided in the household with such child continuously for at least one year." 720 ILCS 5/12-12(c) (West 2008). In the aforementioned counts, the defendant was charged under the second definition of "family member." At trial, the State conceded that A.E.A. did not live with the defendant during the months of August 2007 and September 2007. When A.E.A. moved out of the defendant's home in August 2007, A.E.A. and the defendant ceased to be family members under the second definition of "family member." 720 ILCS 5/12-12(c) (West 2008). A.E.A. returned to the defendant's home in October 2007, and A.E.A. and the defendant once again became "family members" in October 2008. 720 ILCS 5/12-12(c) (West 2008). The State has conceded that because A.E.A. and the defendant did not meet the statutory definition of "family members" during the period from October 2007 through September 2008, the convictions on counts 161 through 208 (a total of 48 counts of criminal sexual assault) must be vacated. While we question the wisdom of the prosecutor in charging hundreds of counts in this case, we find that the victim's testimony and other evidence was sufficient to

---

[4]720 ILCS 5/12-12(c) was repealed and replaced by 720 ILCS 5/11-0.1 (eff. July 1, 2011). Under section 11-0.1, the first definition of "family member" includes a parent, grandparent, child, aunt, uncle, great-aunt, or great-uncle, whether by whole blood, half-blood, or adoption, and includes a step-grandparent, step-parent, or step-child. "Family member" also means, if the victim is a child under 18 years of age, an accused who has resided in the household with the child continuously for at least six months.

support the jury's verdicts of guilty on all counts other than those we have specifically enumerated here.

¶ 74                               III. CONCLUSION

¶ 75   In this case, the jury found that the defendant was not guilty of the charges alleged in counts 153 through 160 of the information. After reviewing the record, we have determined that defendant's convictions on counts 1, 4, 5, 8, 9, 12, 13, and 16, involving predatory sexual assault of a child, must be and are hereby vacated. Likewise, the defendant's convictions on counts 17, 20, 21, 25, 29, 33, 37, 41, 45, 49, 53, 57, and 61, and counts 161 through 208 of the information, finding the defendant guilty of criminal sexual assault, are hereby vacated. The judgment of the circuit court is affirmed as to all other convictions and sentences. Given that a large number of convictions have been vacated, we believe it prudent to remand this case to the trial court to enter an amended sentencing order.


¶ 76   Affirmed in part and vacated in part; cause remanded.